1                UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF WEST VIRGINIA

3   AstraZeneca AB and
    AstraZeneca Pharmaceuticals, LP

4

5          Plaintiffs/Counter-Defendants,

6                vs.                          CIVIL ACTION NO.

7                                             1:18-cv-193

8                                             1:19-cv-203

9   Mylan Pharmaceuticals, Inc.,
    and 3M Company, and

10  Kindeva Drug Delivery, L.P.,

11          Defendants/Counter-Claimants.

12                        - - -

13       Proceedings had in the status conference of the
    above-styled action on, May 13, 2022, before Honorable Irene M.

14  Keeley, District Judge, via Zoom videoconference.

15                        - - -

16       APPEARANCES:

17       On behalf of AstraZeneca:

18       David I. Berl
         Anthony Sheh

19       Williams & Connolly, LLP
         680 Maine Avenue, SW

20       Washington, D.C.   20024
         202.434.5000

21

         Gary M. Rubman

22       Covington & Burling, LLP
         850 Tenth Street NW

23       Washington, DC  20001
         202.486.8181

24

25  APPEARANCES CONTINUED ON NEXT PAGE

 1         Douglas A. Behrens
           Covington & Burling, LLP
 2         850 Tenth Street, NW
           Washington, DC   20001
 3         202.662.5585

 4         Williams & Connolly, LLP
           725 Twelfth St., N.W.
 5         Washington, D.C.   20005
           202.434.5963
 6
           Sandra K. Law
 7         Schrader, Companion, Duff & Law, PLLC
           401 Main Street
 8         Wheeling, WV  26003
           304.233.3390
 9

10         On behalf of Mylan Pharmaceuticals:

11         David L. Anstaett
           Perkins Coie, LLP
12         53 East Main Street, Suite 201
           Madison, WI  53703
13         608.663.5408

14         Shannon M. Bloodworth
           Perkins Coie, LLP
15         700 13th Street, N.W., Suite 600
           Washington, D.C.  20005
16         202.654.6204

17         William J. O'Brien
           Steptoe & Johnson
18         400 White Oaks Boulevard
           Bridgeport, WV  26330
19         304.933.8181

20

21         Proceedings recorded utilizing realtime translation.
           Transcript produced by computer-aided transcription.
22

23

24

25

1              Friday Afternoon Session,

2              May 13, 2022, 12:30 p.m.

3                         - - -

4         THE COURT:  Good afternoon.  This is Judge Keeley.  I

5    understand all the parties are on the line and I just wish to

6    confirm that we have Cindy, our court reporter, with us.

7         So let me call the case and I'll then ask counsel,

8    beginning with local counsel and lead counsel, to note their

9    appearance, please.  This is AstraZeneca AB, et al., versus

10   Mylan, et al.  The lead case is 1:18-CV-193.  The second case

11   is 1:19-CV-203.

12        The parties have requested this status conference.

13   It had been my understanding at the last hearing that we would

14   not need another one, but an issue has arisen, and I'm happy to

15   hear from the parties on the issues today, so would counsel,

16   beginning with AstraZeneca's counsel, please note your

17   appearance.

18        MS. LAW:  Thank you, Your Honor.  This is Sandra Law

19   as local counsel for AstraZeneca.  Also on the line is Gary

20   Rubman, David Berl, Anthony Sheh, and Doug Behrens.

21        THE COURT:  And Ms. Law, do you know who will be

22   leading the argument today on behalf of AstraZeneca?

23        MS. LAW:  I believe primarily Mr. Rubman.

24        THE COURT:  All right.  Thank you very much.  Good

25   afternoon to all counsel for AstraZeneca.

1          Counsel for Mylan.

2          MR. O'BRIEN:  Good afternoon, Your Honor.  William

3    O'Brien with Steptoe & Johnson, local counsel for defendants.

4    And on the line as well for defendants are Shannon Bloodworth

5    and Dave Anstaett, and they will be addressing the Court on

6    issues presented today.

7          THE COURT:  All right.  Thank you.  And good

8    afternoon to all counsel for Mylan.

9          Now, I understand that there are some what I would

10   call courtroom issues, but there's also a legal question that I

11   believe should take priority here today, and that is whether

12   Mylan's fact witness, Stephen Stein, may testify about

13   post-priority date evidence.  And, of course, I think from

14   reading the material, AstraZeneca contends that he may be an

15   expert witness in fact witness clothing, so this is an issue

16   that has been raised first by AstraZeneca, so -- as an

17   objection in the pretrial order, so I'll take it up that way

18   and hear from whoever is going to argue it for AstraZeneca.

19   Thank you.

20         MR. RUBMAN:  Thank you, Your Honor.  This is Gary

21   Rubman from Covington.  Just to clarify one point, I'll be

22   handling this issue, but Tony Sheh from Williams & Connolly

23   will be handling the remaining issues for AstraZeneca.

24         THE COURT:  All right.  Thank you.

25         MR. RUBMAN:  You accurately described the issue that

1  we're raising here.  Frankly, we were surprised to see Mylan

2  attempt to introduce a brand-new invalidity theory for the

3  first time this week, and that theory is that Mylan's and 3M's

4  product development process, which started a decade after the

5  priority date of the '247 patent, is relevant to written

6  description and enablement.

7          This theory is so new that Mylan did not even mention

8  it in its summary of material facts and theories of liability

9  or defense that it included at Exhibit 5D to the pretrial

10 order.

11         In all of our discussions leading up to this trial,

12 Mylan had consistently described this as a two-witness trial,

13 Drs. Pritchard and Young.  Mylan did not say anything about

14 Mr. Stein until they sent their witness list.  And we didn't

15 know about this new invalidity theory until we asked why

16 Mr. Stein was on that list.

17         Now, I think the most straightforward resolution of

18 this, in our mind, at least, is failure to disclose.  And so

19 that's what I was going to focus on.  Mylan never previously

20 disclosed that it intended to rely on its own product

21 development process to support any of its invalidity arguments.

22         Now, it could have and should have done that in its

23 invalidity contentions, but it said nothing about this, and

24 those contentions go back to July 2019.  Those contentions

25 included Section 112 arguments directed at the '247 patent, but

1    they never mentioned anything relating to Mylan's product

2    development process, nor did they reference any Mylan internal

3    documents or witnesses who might testify about that.

4            Second, Mylan's invalidity expert, Dr. Pritchard, did

5    offer opinions on 112 directed to the '247 patent, but just

6    like in the invalidity contentions, he said nothing about

7    Mylan's product development process or its documents, or he

8    didn't even mention any discussions with Mylan witnesses, let

9    alone Mr. Stein.

10           The other area relating to failure to disclose would

11   be the initial disclosures that, as you know, both sides submit

12   to disclose who they may offer to testify at trial.  Mylan

13   never previously disclosed that Mr. Stein would be testifying

14   on invalidity issues.  When it served its invalidity

15   disclosures -- I'm sorry, its initial disclosures, Mylan

16   identified eight witnesses, all current or former AstraZeneca

17   employees, who had said it may call to testify on invalidity

18   issues.  Mylan did not disclose any Mylan fact witnesses that

19   would be testifying on anything relating to invalidity.

20           Now, Mylan did disclose Mr. Stein in those initial

21   disclosures, but the subject of his testimony, they used one

22   word, which was technical.  Now, even if Mylan had properly

23   disclosed this new theory, Mr. Stein's testimony would still be

24   improper.  He never submitted an expert report.  He's clearly

25   not an expert, and I don't believe Mylan's proposing him as

1   such.  But he's also not a POSA.  He doesn't meet the Court's

2   definition, which the Court -- which both sides basically agree

3   on and the Court adopted.

4            The other issue is that Mr. Stein's work at 3M took

5   place almost a decade after the priority date of 2003, and he

6   wasn't even involved in the earliest product development

7   efforts at the company.  So our view -- and I know there's some

8   discussion of the case law in the pretrial order, and I'm happy

9   to talk about it -- is that this is not the type of evidence

10  that, even if properly disclosed, would fall within the narrow

11  exception of *Amgen* for the type of post-priority date evidence

12  that may be permissible.

13           It frankly, to us, sounds more like the type of

14  evidence the Federal Circuit and *Amgen* said is not allowed,

15  which is using this type of evidence to eliminate the state of

16  the art.  And we don't really understand what their theory is,

17  but that's our best guess, that they want to talk about their

18  efforts, the state of the art, during the time period when they

19  were working to develop their product.

20           But the final point I'll mention is prejudice.  This,

21  in our view, is highly prejudicial to AstraZeneca; brand-new

22  invalidity theory on the eve of trial.  Now, with a little bit

23  of irony, you may recall a couple years ago, about two years

24  ago, we sought -- there was an issue about Dr. Berkland's

25  supplemental infringement theory which we served four or five

1    months before the first trial.  That ultimately was not allowed

2    in.  But this situation, in our mind, is even worse.  There's

3    no expert report here, no advance notice, and literally the eve

4    of trial.  For those reasons we ask that you strike Mr. Stein

5    and not allow Mylan to advance this new invalidity theory.

6            THE COURT:  All right.  Thank you.

7            Who's going to argue for Mylan?

8            MR. ANSTAETT:  Good afternoon, Your Honor.  This is

9    David Anstaett of Perkins Coie.  I will argue on behalf of

10   Mylan.

11           THE COURT:  Okay.

12           MR. ANSTAETT:  Your Honor, Steve Stein is a fact

13   witness, and he is not presenting a brand-new invalidity

14   theory.  He's not presenting an invalidity at all.  He is a

15   fact witness who was very involved over the course of many

16   years in the development of defendants' accused ANDA products.

17   He's familiar with all the stability testing that was required

18   to ensure that defendants' products are suitable for

19   therapeutic administration to patients, and he will testify

20   about the amount of work it took to develop a single

21   formulation within the broad scope of the asserted '247 patent

22   claims.

23           And we anticipate that his direct testimony, which

24   will be entirely factual in nature, will take about 30 to 45

25   minutes.  And I do want to stress, when I say entirely factual

1   in nature, Mr. Stein is not going to offer an opinion about

2   whether the claims are definite or whether they are described

3   adequately or whether they are enabled.  He's not going to be

4   doing that because he's not going to be testifying as an expert

5   witness.

6         So why is this testimony relevant?  Well, as the

7   Court knows, the prior patents in this case recited precise

8   grades and concentrations of ingredients, including PVP, which

9   in the prior patents was grade K25, and in a very specific

10  concentration of .001 percent.  And as the Court also knows, we

11  don't infringe those claims because defendants' products have a

12  different PVP concentration, so AstraZeneca has now dropped its

13  infringement claims as to those three patents.

14         The '247 patent, which is the one at issue in the

15  upcoming trial, has immeasurably broader claims than the

16  patents in the first trial.  Just as an example, Claim 1, which

17  AstraZeneca is asserting, simply recites a stable quote/unquote

18  formulation, with absolutely no limits on the grade or

19  concentration of PVP and PEG or any form or amount of

20  budesonide and formoterol, so the claims are very broad.  And

21  because of that, defendants have stipulated to infringement of

22  the asserted '247 patent claims, but we are defending on

23  Section 112 grounds.

24         And as the Court knows, when it comes to written

25  description and enablement, a patentee has to show the full

1    scope of the claims are described and enabled, not just a

2    handful of examples, but the full scope of the claims, and that

3    means that the specification has to show that the skilled

4    artisan knows how to make and use the full scope of the claims

5    without undue experimentation and that the inventors were

6    actually in the possession in the full scope of those claims.

7            And that's what the Federal Circuit's case law makes

8    abundantly clear is that an accused infringer's efforts to

9    develop a product that falls within the scope of the broad

10   claims is relevant to assessing written description and

11   enablement.  And why is that?  Because if you have very broad

12   claims and it takes the accused infringer a significant

13   quantity of experimentation to develop a single product, a

14   single embodiment within the scope of those claims, that's

15   relevant to whether the specification shows possession of the

16   full scope of the claims and whether or not the claims require

17   undue experimentation to practice.

18           And that's what the *Amgen v. Sanofi* case that we cite

19   in the pretrial shell stands for.  There you had an accused

20   infringer who sought to introduce fact testimony about its

21   product development efforts to support its written description

22   and enablement defenses, and the District Court excluded that

23   evidence because it was post-priority date evidence and the

24   Federal Circuit reversed and it remanded for a new trial so

25   that that precise evidence could be considered.

1            And it's entirely appropriate to consider that same

2     kind of evidence in this case.  This is not expert testimony.

3     As I said, Mr. Stein is not going to get on the stand and offer

4     an opinion about whether the claims are definite, described, or

5     enabled.  He's going to give factual testimony about

6     defendants' product development efforts.

7            And on that topic, he was deposed not once, but

8     twice, on, again, the very topic that he will be testifying

9     about, defendants' development of the ANDA products.  He was

10    quizzed by AstraZeneca on that topic, using more than 70

11    exhibits, over the course of two depositions, most of them

12    dealing with product development.  He was a 30(b)(6) corporate

13    witness for the defendants on multiple topics related to the

14    research and development and stability of the ANDA products.

15           So AstraZeneca not only had every opportunity to quiz

16    Mr. Stein on the issues he's going to be testifying about; it

17    took those opportunities over the course of two very lengthy

18    depositions.

19           The notion that I heard my friend on the other side

20    suggest was that the only way this can be relevant is if

21    Dr. Pritchard relied on Mr. Stein's testimony in his expert

22    reports is simply false.  They don't cite a single case for

23    that proposition in the pretrial shell.  Written description,

24    as Your Honor knows, is a fact question, and enablement is a

25    legal question that's based on a number of underlying factual

1   findings.  And Mr. Stein will be giving factual evidence that

2   the Court can evaluate in assessing defendants' 112 defenses.

3        We disclosed Mr. Stein, as they concede, in our

4   initial disclosures, as a witness with technical information

5   who defendants may use to support their claims or defenses, and

6   that is precisely how he is being used, as a fact witness with

7   technical information on our product development that is going

8   to be used to support our claims and defenses.

9        And again, the notion that this is some new

10  invalidity contention is wrong.  In our invalidity contentions

11  from the beginning of this case we contended that these claims

12  are so broad that they require -- and the disclosure and the

13  specification so narrow that they require undue experimentation

14  to practice the whole scope of the claims.  And that's exactly

15  what this testimony, this factual testimony, is designed to

16  show.

17       And so I think that the case law is on our side.  I

18  think that's what happened in *Amgen* and *Sanofi* was it's exactly

19  what happened here.  We want to talk about our product

20  development effort.  It was long and laborious and the District

21  Court excluded it and then the whole case had to be remanded to

22  hear that evidence again because the Federal Circuit made clear

23  post-priority date evidence of an accused infringer's product

24  development effort is relevant to these 112 issues.

25       And again, that's exactly what Mr. Stein was

1   disclosed as a witness on, the factual description and the

2   facts underlining the development of our product.  He's not

3   going to be testifying about the state of the art, illuminating

4   the state of the art at some later time period.  He's not going

5   to be testifying about that, so I just feel very strongly that

6   the case law, the disclosures in this case, the fact that he

7   was subjected to dozens of hours of deposition on all the kind

8   of documents he's going to be asked about in a relatively short

9   direct examination at trial, I don't see any basis for striking

10  him.

11          THE COURT:  All right.  Thank you.

12          Did AstraZeneca want to respond?

13          MR. RUBMAN:  I would like to.  Thank you, Your Honor.

14          I'm not going to go through everything.  I'm not

15  going to litigate here the 112 issues.  There will be plenty of

16  time for that next week.

17          A few points.  Mr. Anstaett referred to the

18  invalidity contentions, but what he didn't refer to was any

19  disclosure in there that they intended to rely on this type of

20  evidence.  There is nothing.  And I think that's undisputed and

21  that's a really important fact here is when you get down to

22  this, you don't even need to get to *Amgen.*  There's a failure

23  to disclose here.  There's a last-minute disclosure of a new

24  theory here, and that's at the core of the problem here.

25          Mr. Anstaett is right that we deposed Mr. Stein.

 1    That deposition was not directed to any 112 issues, because he

 2    wasn't disclosed for that.  It was really directed to, for the

 3    most part, infringement issues.  So we haven't had a chance to

 4    depose Mr. Stein with an eye toward the 112 issues because we

 5    didn't know that he was going to be testifying on anything

 6    relating to invalidity.

 7         *Amgen* -- just to be clear there, *Amgen* did allow some

 8    evidence of post-priority date product development efforts, but

 9    it was a very different case, and the court was clear that

10    those were limited exceptions.  That case involved claimed

11    antibodies and it was an issue about whether or not there was a

12    sufficient number of specific antibodies disclosed, and so

13    there was a lot of back and forth on that; a very different

14    issue than what we face in this case.

15         At the end of the day, the -- if Mr. Stein were

16    allowed to offer this testimony, someone has to say that this

17    work, this process development efforts by Mylan, was undue

18    experimentation.  Dr. Pritchard cannot say that.  He did not

19    talk about Mr. Stein.  He didn't offer any opinions, so they

20    are ultimately not going to have any expert who's going to be

21    able to refer or offer an opinion based on any of this product

22    development work.

23         And then I guess the final point I make, and I wrap

24    up because I know there's other issues, Mr. Anstaett obviously

25    made a lot of comments there.  All of this -- all of these

1   facts, all of this testimony, could have been in

2   Dr. Pritchard's report.  It could have been disclosed earlier.

3   None of it was.  We were surprised, and we don't think it's

4   fair to allow such a late disclosure of a new theory into the

5   case.

6          THE COURT:  All right.  Let me ask some questions and

7   I'll start with you, Mr. Rubman.

8          This '247 patent was certainly not before me in the

9   earlier trial, but all of the discovery to which you're making

10  reference occurred in the lead-up to the earlier case, right?

11         MR. RUBMAN:  That is correct.  The '247 patent was in

12  the case back when we were in Delaware, and it stayed in the

13  case when we moved to West Virginia.  The initial disclosures

14  that I mentioned and the invalidity contentions were actually

15  back from when the case was in Delaware, so it's been going on

16  for a while.  It's been in the case for a while.

17         THE COURT:  All right.  Should that be of any

18  interest or concern to me based on the arguments you're making?

19         MR. RUBMAN:  It shouldn't be.  I think that supports

20  us, because it's all the more reason why there should have been

21  disclosures years ago, but there weren't.  This patent has been

22  in the case, they've offered invalidity and, frankly, 112

23  arguments with respect to the '247 patent going back to 2019,

24  and so it's been in the case for a long time and they've said

25  nothing on this theory.

1          THE COURT:  All right.  Mr. Anstaett, would you like

2     to respond to that issue?

3          MR. ANSTAETT:  I disagree, Your Honor.  This is not

4     an invalidity theory.  This is factual testimony that goes to

5     the theories of invalidity that have been in this case since

6     day one.  And that is -- and the *Amgen* case is not a very

7     different case.  The *Amgen* case is on all fours here.  The

8     *Amgen*, just like this case, involved very broad claims to

9     antibodies that had certain structural requirements and then a

10    functional requirement, was it effective.

11         And here we have these very broad structural

12    requirements in the '247 patent claims.  Unlike the previous

13    patents, here it's just any PVP, any PEG, at any concentration,

14    with any amount of budesonide or any amount of formoterol, so a

15    very, very broad claim and then a functional requirement,

16    stable.  Okay?  And that is exactly on all fours with what was

17    going on in the *Amgen* case.

18         And our position all along has been those claims are

19    so broad and the disclosure in the specification so narrow that

20    you cannot practice the full scope of the claims without undue

21    experimentation.  And on written description, it doesn't show

22    possession of the full scope of the claims.

23         And what Mr. Stein's testimony goes to is not expert

24    testimony.  It doesn't require somebody to talk about this in

25    an expert report.  There's no suggestion in *Amgen* that that's

1   what was happening there.  It's simply that, as the Court

2   knows, we have a different PVP concentration and we have

3   admitted, because these claims are so broad, we have conceded

4   infringement.  We're within the scope of the claims.  And then

5   the question becomes if even one embodiment within the scope of

6   these broad claims you had to engage in just an enormous amount

7   of experimentation to get a formulation that was stable and

8   therapeutically effective, that factually is relevant to the

9   *Wands* factors in the enablement inquiry.

10          So this is not a new invalidity theory.  It is

11   evidence that the Court can consider.  Obviously, if the Court

12   allows Mr. Stein to testify, you'll hear it and you will

13   evaluate it and weigh it on the factual questions that are

14   written description and the factual analyses that underpin the

15   enablement requirement.

16          And so our theory has not changed here, that undue

17   experimentation is required, that they haven't shown

18   possession.  And as I say, Mr. Stein is going to testify simply

19   about the product development effort that defendants underwent.

20   And as I say, he was deposed ad nauseam on those topics over

21   the course of two depositions, when this case was in West

22   Virginia, in this court, and quizzed about the documents that

23   showed testing for -- can we show this product is stable.

24          And so I just -- I completely disagree with the

25   notion that this is some kind of new invalidity theory.  It's

1  not.  It's factual testimony from a fact witness who was

2  disclosed as such that is relevant to these inquiries.

3          THE COURT:  All right.  So if we're looking at the

4  *Amgen* case and we were to analogize this issue to what the

5  question there was, we're talking about post-priority date

6  evidence, and it seems to me that what AstraZeneca's argument

7  focuses on is not that so much as the disclosure question of

8  whether there was a failure to disclose that this evidence was

9  going to be used in order to support the invalidity theories of

10 indefiniteness, written description, and enablement that have

11 been in the case with regard to Section -- or this patent,

12 '247, from the beginning.

13         Am I wrong about how AstraZeneca has focused its

14 argument, Mr. Rubman?

15         MR. RUBMAN:  Well, you are correct that I focused my

16 argument on the failure to timely disclose this fact evidence

17 as being something that they were going to rely on to support

18 their invalidity theory.  That was the focus.  The *Amgen*, I did

19 note, is frankly not on point, in our mind.  It's a very

20 different type of claim directed at a monoclonal antibody, and

21 we don't agree with Mr. Anstaett's analysis that it's the same

22 case.  But you're right that I think the first threshold issue

23 in our minds is, the first time we've heard about this theory

24 in the three plus years we've been litigating it was a couple

25 days ago.

1           THE COURT:  All right.  One of the interesting

2    factors, in my experience trying these patent cases, is that

3    there are never any surprises, or at least the parties don't

4    think there should be any surprises or indeed even any

5    curveballs thrown when it comes to the evidentiary issues in

6    the case.

7           I understand that all trial lawyers have to be facile

8    and they have to be able to adjust to developments as trial

9    occurs, and what I think is happening here is that we're

10   talking about a witness who has been known to AstraZeneca for

11   some time and as we've drawn closer to the trial date next

12   week, there's been drilling down into what actually is Stein

13   going to talk about.

14          I don't think there's any issue that he's been

15   presented as a POSA.  He couldn't be.  He doesn't meet the

16   definition, nor do I think that he's in any way, shape, or form

17   a fact witness -- I mean an expert witness, excuse me.  He is,

18   in point, a fact witness, and I do think that *Amgen* is somewhat

19   if not wholly on point, since here I don't find that Mr. Stein

20   is being admitted or has testimony that will be admitted on the

21   state of the art on the priority date, which is what a POSA

22   would be talking about.  He's going to show that -- or be used

23   to support Mylan's theory of the case under invalidity that the

24   '247 patent is so broad that it does not in its specification

25   disclose the representative -- or didn't fully represent the

1    aspects of stability that I think are still going to be highly

2    contested here.

3             Is that essentially -- have I grabbed the essential

4    aspect of your argument, Mr. Anstaett?

5             MR. ANSTAETT:  Yes, you have, Your Honor.

6             THE COURT:  All right.  So if we're looking at it

7    that way, Mr. Rubman, I believe this witness should be allowed

8    to testify.  This is a trial to the Court.  I'm not worried

9    about confusing a jury or misleading a jury.  I have the

10   ability, I believe, to weigh this testimony and to determine

11   whether it is within the sphere that I think *Amgen* would allow,

12   or if it veers off into other areas that ought not to come in,

13   particularly when we're talking about the fact that this is not

14   to be offered for what was the state of the art at the time.

15            I believe that I can make that determination.  I'll

16   hear your objections.  And candidly, I don't want to fall into

17   the error of not admitting something preemptively that the

18   Federal Circuit may later say should have been admitted during

19   the course of this trial.  I can admit this, weigh it,

20   determine whether or not it has any role to play in my

21   evaluation of the three Section 112 issues that I have to

22   evaluate.  I would rather do it that way than make the mistake

23   up front and have to try the case a third time.

24            So we'll go with that ruling of mine today that

25   Mr. Stein can testify on the issues that I understand he's

1   being offered to support, and we can discuss all of this during

2   trial as necessary, and obviously posttrial as well.

3           So to the extent that this is an objection in the

4   nature of a motion in limine, I'm overruling the objection to

5   the admissibility of Mr. Stein's testimony and specifically on

6   the issue of failure to disclose, as I stated briefly before,

7   but I'll put it in more detail here.  I think this is not a new

8   theory so much as new aspect to theories that have been in the

9   case from the beginning, and to that extent I don't see this as

10  surprising or prejudicial to AstraZeneca.

11          As I said, we tend to -- in my experience, tend to

12  follow scripts in these trials more than you would see it in

13  other types of cases, and that this may not have been so

14  scripted from the first day the '247 patent was challenged, to

15  me does not mean that it can't be used in this case.  Those are

16  my reasons for overruling that.

17          What I'd like to do now is to move on to the next

18  issue, and why don't we start with how the parties -- will the

19  parties introduce testimony by deposition.  I know you don't

20  agree on this, which I find surprising, candidly, but let me

21  hear from AstraZeneca and then from Mylan.

22          MR. SHEH:  Good afternoon, Your Honor.  This is Tony

23  Sheh.

24          THE COURT:  You're going to have to speak up,

25  Mr. Sheh.  I'm sure the court reporter is having the same

1  problem I am.  You're not nearly so solid and clear as

2  Mr. Rubman was.

3          MR. SHEH:  Understood, Your Honor.  That was going to

4  be my first question.  Is this any better, Your Honor?  Thank

5  you, Your Honor.

6          So I think based on -- I think Your Honor has asked

7  the question about the manner in which deposition designations

8  will be introduced at the upcoming trial.  And by our

9  computation, the plaintiffs have designated about five and a

10  half hours of testimony.  And it's about, by my estimate, three

11  hours on the Mylan side, about two and a half hours, so roughly

12  let's call it a 50/50 split there.  And that -- I fully suspect

13  the parties will narrow their designations in the coming days,

14  but that will still leave a significant amount of trial time

15  devoted to just playing designations.

16          And I think the other factor here, Your Honor, is

17  that the parties agree that the testimony from the October 2020

18  trial is already part of the record and so the Court -- need

19  not be read or otherwise introduced as such into the new trial.

20  And so the Court is essentially receiving a great amount of

21  testimony that has already been recorded in some form, and we

22  feel that the deposition designations coming in the same way

23  places that on the same footing.

24          And it would just be more -- given this trial has

25  been scheduled for two days, maybe three to accommodate any

1    potential rebuttal case, but if we -- we like to make an

2    efficient use of Your Honor's time, the Court's time, the

3    parties' time, and the witnesses' time.  And given the amount

4    of testimony that is just coming in as -- in written form

5    essentially from October 2020, we think it just makes sense to

6    designate and provide those written submissions to Your Honor.

7                THE COURT:  All right.  If I could summarize what I'm

8    hearing.  And I'm going to have to ask you to turn off your

9    microphone, Mr. Sheh, because I'm getting the feedback of my

10   own words.  Thank you.

11               You believe that the most efficient way to submit

12   this testimony would be to do it by highlighting -- transcripts

13   that highlight the testimony each side is submitting.  Is that

14   it?

15               MR. SHEH:  That's correct, Your Honor.

16               THE COURT:  All right.  So and you support that by

17   saying, well, Judge, you're going to have to read through the

18   testimony from the first trial anyway, so here's another couple

19   of hours more reading for you to do.  Is that it?

20               MR. SHEH:  I think Your Honor will be guided through

21   the relevant portions of the testimony from October '20 by the

22   parties' agreements, the posttrial briefing, indeed, what the

23   witnesses at the upcoming trial would be -- will be sort of

24   challenged with or used to support their arguments, so I do not

25   think that the Court will need to read the entire October 2020

1    transcripts, but that October 2020 transcript is very much part

2    of this case.

3           THE COURT:  All right.  Without even hearing from

4    Mylan yet on this issue, I just want both sides to understand

5    that this is what I'm talking about when we're talking about

6    scripted trials.  I want to see the witnesses.  I want to hear

7    from the witnesses, as I'm able to do so, and as it can be done

8    efficiently.  After all, I am the finder of fact, correct?  So

9    let's go ahead and play these depositions, but I don't think we

10   should break it up.  I think if we've got a witness, we should

11   go ahead, play the witness' excerpts, and I should hear this

12   witness as close to real time as I can.

13          Mylan, I understand, is saying, well, let us play our

14   excerpts in our case, let AstraZeneca play them in its case.

15   I've done that before.  I think I'm capable of understanding

16   which side is eliciting which testimony.  Why can't we just

17   play these depositions as excerpted straight through?  I assume

18   we've got to get rid of all the objections and that I'm not

19   going to have to bear listening to the objections that are no

20   longer relevant at trial?

21          MS. BLOODWORTH:  Your Honor, this is Shannon

22   Bloodworth.  I just wanted to say we agree with that

23   wholeheartedly, Your Honor, and frankly, my experience with

24   this has been that as the parties get closer to having to play

25   the videos live, it does get cut down.

1          For example, we have 12 minutes designated of their

2    inventor, Dr. Marlow, who they're not bringing to this trial.

3    They have 30 minutes, about, so I'm sure that one is going to

4    be quite short at the end of the day, by the time we finish,

5    and we will remove our objections and play for Your Honor each

6    witness in total at one time.

7          THE COURT:  Okay.  I want both sides to understand, I

8    don't mind listening to this testimony.  It's my job.  I'm the

9    finder of fact, as I reiterate.  So please, what I do care

10   about is that you do work through these transcripts and

11   eliminate those objections or that argument that -- as it came

12   up during the deposition that I don't need to hear about or

13   rule on.  So I hope that is clear to you.  Go ahead, play the

14   depositions, and don't break them up so that we're jumping back

15   and forth.  Just play them through.  And hopefully that will

16   take care of this issue.

17         I would ask you, Mr. Sheh, do you have any other

18   objection to that ruling?

19         MR. SHEH:  I certainly have no objection, Your Honor.

20   I just want to assure Your Honor that we will be removing

21   objections and colloquies from the -- what is played.  The

22   parties agree to that.  And, of course, if there are any

23   disputes, they will be raised before the video playing, so I

24   can assure you --

25         THE COURT:  Right.  If I have to rule on an objection

1   based on the video testimony, I'm sure you understand that I

2   will do that.  But what I don't want is just these cold page

3   submissions when the witness -- is a video of the witness and I

4   can observe the witness.  I think seeing the witness' demeanor

5   can also be very important.  Obviously, I'm the fact finder.

6   Okay?  Thank you.

7           MR. SHEH:  Understood.

8           THE COURT:  The next question relates to this, and

9   that is to what extent may the parties use evidence introduced

10  during the 2020 trial.  And I just heard from AstraZeneca that

11  excerpts will be admitted from the 2020 trial and -- I'm not

12  sure I understand what the dispute is here.  Maybe I could hear

13  from Mr. Sheh and then from Ms. Bloodworth.

14          MR. SHEH:  Sure, Your Honor.  I'm happy to clear this

15  up.  My understanding is that the parties have reached

16  essentially an agreement that the witnesses' testimony from the

17  October 2020 trial is part of the record in this case.  We do

18  not currently plan to submit what we call trial designations of

19  that transcript to Your Honor, but we are certainly happy to do

20  that if that would be helpful.  But I think the parties will

21  simply just cite to it in their briefing and argument and leave

22  it at that, so I don't think that there's much dispute about

23  what of the October 2020 trial witness testimony is in.  I

24  think the parties agree that it's all in.

25          THE COURT:  Well, obviously the testimony that will

1    be admitted and relied on by me in this case, it will be

2    testimony that is relevant, right, under 401.  And maybe not

3    everything from the 2020 trial is relevant to the issues here.

4    I mean, I know it won't all be in there, so I'll rely on all of

5    you to let me know in your briefing, by your citations, what

6    testimony you believe is relevant and admissible, and I'll be

7    sure to look at it, okay?

8            So if that's the only issue we have there, let's move

9    on to this question of who, if anyone, may be in the same room

10   as the witness testifying remotely.  And am I correct that if I

11   drill down to the heartland issue here, one side or the other

12   is afraid that there's going to be an ethical violation and

13   someone's going to be trying to influence the testimony of a

14   witness under oath?  I hope that's not what I'm dealing with

15   here, but it sounded like that's what I was dealing with.

16           MR. SHEH:  This is Tony Sheh from Williams &

17   Connolly, Your Honor.  I don't think that is where we intend to

18   go on that at all with this.  In the October 2020 trial, of

19   course, the witnesses were in a separate room by a sort of

20   default because of the COVID-19 situation.  But, as we

21   understand it, there is possibility now that the witnesses will

22   be in the same building as the -- as the examining attorney and

23   their team.

24           And it is not so much that we believe that there will

25   be any ethical violation; far from it.  It is just that in the

 1  remote world we don't have eyes on all parties to observe

 2  what's going on.  It may not be anything that is intentional,

 3  but if there's an issue that crops up, we have no way of

 4  knowing that to be the case.

 5           And it also just strikes me that this use of a

 6  separate testifying location has been a -- has been a fairly

 7  standard practice in sort of remote trial or deposition

 8  practice.  But I hear Your Honor.  So it is not that we think

 9  that there's going to be an ethical violation.

10           THE COURT:  Was that Mr. Sheh?

11           MR. SHEH:  Yes, that is, Your Honor.

12           THE COURT:  Thank you.

13           Ms. Bloodworth, did you want to respond or add

14  anything?

15           MS. BLOODWORTH:  Your Honor, not much.  Obviously, we

16  don't anticipate having any unintentional hand gestures or

17  anything to the witnesses.  We simply are not sure what our

18  setup is going to look like yet, if our witness and our

19  questioner will be in the same room, or if we'll all be remote.

20           When this issue came up, we said we're not sure yet.

21  We'll let you know.  And we want to let you know we may be in

22  the same building.  I think this is much ado about nothing,

23  unfortunately, but we obviously would never do anything

24  unethical, and we assume AstraZeneca's attorneys would not as

25  well.

```
 1              THE COURT:  I would just thank both of you for the

 2   assurances and remind everyone that I know you're highly

 3   ethical officers of the court and that the case will be

 4   presented as it must be, without any attempt to influence the

 5   testimony of the witnesses.

 6              Should an issue arise that causes concern to either

 7   side, I would be happy to address it at that time, and you can

 8   certainly outline for me how your witness will be appearing,

 9   where he or she may be located, and if that raises a concern

10   for the other side, I can address it.

11              Now, may Mylan present a rebuttal case.  I know

12   AstraZeneca's position is that no rebuttal case is necessary

13   because there are only two live witnesses for trial, but as I

14   said during our last conference, I believe, if Mylan, who bears

15   the burden in this case, believes it has a rebuttal case, I'm

16   happy to consider letting them put it on once I understand what

17   they want to do.

18              If I don't think a rebuttal case is appropriate, then

19   they won't get to do it, but up until that point in time, they

20   certainly have the opportunity to introduce rebuttal as it is

21   appropriate under the rules.  All right?

22              So with that issue, I think the only thing left is

23   whether exhibits should be marked up live at trial.  And are we

24   talking primarily here about demonstrative exhibits, or is

25   there something that I'm missing?
```

 1          MR. SHEH:  This is Tony Sheh again, Your Honor.  It

 2   is not -- it wouldn't be demonstratives.  The parties agreed --

 3   this is actually a very narrow issue, as I understand it.  The

 4   parties agree that demonstratives will be exchanged.  This is

 5   simply markup to already disclosed exhibits; in other words,

 6   exhibits that one side has already informed the other that they

 7   will be using on direct.  These are essentially, go to page 2,

 8   column 26, highlight the third paragraph of sentence -- of

 9   the -- whatever sentence.

10          And I believe at the first trial it was permitted to

11   prepare those sort of callouts and mark those versions in

12   advance without exchanging them, because, again, the entire

13   exhibit has been disclosed to the other side, and we're simply

14   trying to follow an efficient practice from the first trial.

15          THE COURT:  Now, before I hear from Ms. Bloodworth,

16   what I'm sure you understand, Mr. Sheh, that most judges, to

17   avoid confusion and controversy, require that demonstratives be

18   exchanged prior to their use.  And so if parties are going to

19   use demonstratives at trial, whether in opening statements or

20   through a witness, they need to be marked so that they can be

21   indicated appropriately on the record at trial.  If that's what

22   you were saying you were going to do, that's fine with me.

23          Let me hear from Ms. Bloodworth as to whether there's

24   something I've missed.

25          MS. BLOODWORTH:  Thank you, Your Honor.  I think the

1    concern or at least the confusion is that it sounded to us like

2    plaintiffs wanted to mock up in advance documents, perhaps not

3    in PowerPoint, but in PDF, for example, and alter documents

4    with highlighting and balloons or arrows and not call them

5    demonstratives so they didn't have to exchange them in advance.

6            In our last trial and in all of my trials before Your

7    Honor, we have always exchanged any preprepared markups,

8    whether it be of a document in PDF or a PowerPoint, so we were

9    operating from that procedure and planning to exchange those

10   documents that were not -- anything that was basically

11   preprepared by counsel for use in front of the Court.

12           THE COURT:  Well, if that's the concern, then let me

13   make it clear, yes, I want those exchanged beforehand in the

14   effort to avoid surprise and controversy as we get this case

15   under way.

16           Mr. Sheh, is that acceptable to AstraZeneca, or do

17   you have a further objection?

18           MR. SHEH:  I understand Your Honor's position and we

19   have no further objection, Your Honor.

20           THE COURT:  Thank you.

21           Have I covered all the issues other than to let you

22   know that we're still waiting for TrialGraphix to give us their

23   log-in information.  I think you all are the ones who are

24   supposed to let us know that.  So when you get it, would you

25   please give it to us as soon as you can?

1           MR. SHEH:  Yes, Your Honor.  This is, again, Tony

2   Sheh, and we are working on it.  I do want to alert Your Honor

3   to the fact that, as we understand, TrialGraphix is not

4   available due to their own trial schedule, and we are in

5   contact with another remote vendor that will provide the same

6   remote experience that --

7           THE COURT:  I'm sorry, Mr. Sheh, you got garbled

8   there in the last 30 seconds or so, so I missed everything

9   after TrialGraphix is not available due to its own trial

10  schedule.

11          MR. SHEH:  Apologies, Your Honor.  Because

12  TrialGraphix is not available, we are in contact with another

13  remote trial vendor that will provide the same Zoom platform

14  that we have used in the past.  It's just going to be a

15  different provider.  And the parties are working out those

16  minor details and we fully intend to provide Your Honor with

17  the log-in details as soon as we can.

18          THE COURT:  All right.  One of the reasons we need

19  that as soon as possible is we have to get it up on our website

20  so those members of the public who wish to view the trial can

21  have that information to log in, of course.  Okay?  And I

22  assume that this different provider will have the same ability

23  to move the parties into rooms when we have testimony that may

24  need to be under seal because of its nature.

25          MR. SHEH:  That is my understanding, Your Honor, yes.

```
 1              THE COURT:  All right.  Good.  Thank you very much

 2    for that.

 3              Ms. Bloodworth or Mr. Anstaett, anything to follow up

 4    on with Mylan?

 5              MS. BLOODWORTH:  Nothing further from Mylan.  Thank

 6    you, Your Honor.

 7              THE COURT:  You're welcome.

 8              Mr. Rubman, Mr. Sheh, anything further for

 9    AstraZeneca?

10              MR. BERL:  Your Honor, this is David Berl.  If I may

11    just raise one further issue relating to scheduling in view of

12    the fact that the depositions are going to be played on

13    videotape and the navigation of the documents will have to

14    happen live rather than beforehand.  We just want to make sure

15    that one way or the other that Dr. Young completes his

16    testimony Friday.  I don't foresee that being a problem, but as

17    Your Honor may know, he's a foreign witness.  He lives in

18    Australia.  And we've assured him repeatedly that he will be

19    done Friday, and he's booked and arranged his life and he has

20    to leave after Friday.  I just wanted to raise that in the

21    event that it becomes an issue, so if needed some testimony

22    could go out of order in terms of a deposition or otherwise.

23              THE COURT:  Nice hearing from you, Mr. Berl, and I

24    certainly will make every effort to assure that Dr. Young is on

25    and off on Friday.  We can begin whenever it works for you all
```

```
 1   and for him, and if he has to be taken out of order, I know

 2   that Mylan understands that I will allow that based on the

 3   scheduling issue that Dr. Young has.  All right?

 4              MR. BERL:  Thank you, Your Honor.

 5              THE COURT:  Keep me apprised and I will -- all of us

 6   will pivot as necessary to make sure Dr. Young is not

 7   inconvenienced.

 8              Now, anything final before we adjourn?

 9              MR. BERL:  No, Your Honor.

10              THE COURT:  All right.  If not, I thank you all and

11   wish you a pleasant weekend and pleasant trial preparations, I

12   guess.  I'll be with you all next Thursday and Friday unless

13   another issue arises, I assume.  And my clerk is looking at me

14   and saying she's sure there will be no other issues, so good

15   luck with that.  Thank you.

16              (Proceedings concluded at 1:21 p.m.)

17

18

19

20

21

22

23

24

25
```

1                        CERTIFICATE

2        I, Cindy L. Knecht, Registered Professional Reporter and

3   Official Reporter of the United States District Court for the

4   Northern District of West Virginia, do hereby certify that the

5   foregoing is a true and correct transcript of the proceedings

6   had in the above-styled action on May 13, 2022, as reported by

7   me in stenotypy.

8        I certify that the transcript fees and format comply with

9   those prescribed by the Court and the Judicial Conference of

10  the United States.

11       Given under my hand this 16th day of May 2022.

12               /s/Cindy L. Knecht
                 _____
13               Cindy L. Knecht, RMR/CRR
                 Official reporter, United States
14               District Court for the Northern
                 District of West Virginia

15

16

17

18

19

20

21

22

23

24

25